UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAWN LACHANCE TILLEY,                )
                                     )
                    Plaintiff,       )
                                     )
          v.                         )    No.  4:07CV801 FRB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
                    Defendant.       )

**MEMORANDUM AND ORDER**

          This cause is before the Court on appeal of an adverse
ruling of the Social Security Administration.  All matters are
pending before the undersigned United States Magistrate Judge, with
consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

          On July 28, 2005, plaintiff Dawn Lachance Tilley filed an
application for Disability Insurance Benefits (DIB) pursuant to
Title II, 42 U.S.C. §§ 401, et seq.; and for Supplemental Security
Income (SSI) pursuant to Title XVII, 42 U.S.C. §§ 1385, et seq.,in
which plaintiff claimed she became disabled on December 12, 1998.
(Tr. 37-42, 96-98.)  On initial consideration, the Social Security
Administration denied plaintiff's claims for benefits.  (Tr. 32-36,
46-50, 74-78.) On August 7, 2006, a hearing was held before an
Administrative Law Judge (ALJ).  (Tr. 336-44.)  Plaintiff testified
and was represented by counsel.  On December 6, 2006, the ALJ
issued a decision denying plaintiff's claims for benefits.  (Tr.

11-19.)  On March 19, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 2-4.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on August 7, 2006, plaintiff testified in response to questions posed by counsel.  Plaintiff is separated from her husband and lives with her three seven-year-old daughters.  Plaintiff also has a twenty-seven-year-old son.  (Tr. 338-39.)  Plaintiff has a fourth grade education.  Plaintiff attended regular classes.  Plaintiff left school due to pregnancy.  Plaintiff can read and write but needs help with paperwork.  (339.)

In her Vocational Report, plaintiff reported that she worked as a waitress from 1983 to 1995.  Plaintiff worked as a cashier in a discount department store from 1988 to 1998.  Plaintiff worked as a factory worker from 1994 to 1998.  (Tr. 99.)  Plaintiff testified that she can perform manual labor, but cannot advance in her work because she is unable to do the paperwork.  (Tr. 340.)

Plaintiff testified that she has not worked since her triplet daughters were born and that she has hepatitis C.  (Tr. 340.)  Plaintiff testified that she received Interferon treatment for the disease two years prior.  Plaintiff testified that the treatment did not help her condition and that she became more ill.  Plaintiff testified that she feels as though she has the flu and

that her bones ache. (Tr. 341.)

Plaintiff testified that with her illness, it is difficult to care for her children. (Tr. 341-42.) Plaintiff testified that she receives no help from her family. Plaintiff testified that she sometimes cooks and cleans, but that she some- times lets the dishes sit on her worst days. Plaintiff testified that she sometimes goes three days without bathing. (Tr. 342.)

Plaintiff testified that she is depressed and does not go anywhere. Plaintiff testified that she cries for no reason. (Tr. 342.) Plaintiff testified that she does not sleep and that she constantly bites her lip and tongue. Plaintiff testified that she last saw a therapist three months prior, but that the therapist has since moved. Plaintiff testified that the three therapists who have been recommended to her do not accept her insurance. Plaintiff testified that she had been taking Cymbalta and Lorazepam, but that she no longer takes the medication and has no way to obtain it. (Tr. 343.)

Plaintiff testified that she does not drink alcohol although she did in her childhood. (Tr. 344.)

### III.  Medical Records

On August 26, 2000, plaintiff visited Dr. Carl Blatt at St. John's Mercy Hospital for evaluation of hepatitis C. Plaintiff was thirty-six year of age. It was noted that plaintiff had been diagnosed with hepatitis C in 1995. Dr. Blatt noted that plaintiff was previously unable to undergo treatment due to loss of

insurance.  Plaintiff was currently asymptomatic.  Plaintiff had been fatigued, but this was noted to have resolved.  Dr. Blatt also noted plaintiff's previous history of illicit drug use.  Dr. Blatt provided plaintiff information regarding transmission of the disease.  A liver biopsy procedure was recommended.  (Tr. 266-67.)

Ultrasounds of plaintiff's liver and gallbladder performed on September 1, 2000, were normal.  (Tr. 263.)  A liver biopsy performed that same date showed chronic hepatitis C with grade 1 inflammatory activity and stage 1 fibrosis.  (Tr. 262.)

On October 12, 2000, plaintiff failed to appear for a scheduled appointment with Dr. Blatt.  (Tr. 260.)

Plaintiff visited Dr. Blatt on October 25, 2000. Information was given regarding hepatitis vaccinations.  Plaintiff indicated that she would check with her insurance company to determine whether such vaccinations were covered.   Interferon treatment was also discussed, including potential long term side effects such as depression and short term side effects such as flu-like symptoms and hair loss.  Dr. Blatt noted that the duration of plaintiff's treatment would most likely be one year.  Plaintiff was instructed to follow up with Dr. Blatt in January.  (Tr. 251, 253.)

Plaintiff did not return to Dr. Blatt until November 26, 2002.  Plaintiff reported that she was ready to begin treatment for hepatitis C.   Plaintiff also reported that she had been experiencing pain in her back during the previous year, with such pain radiating around the right flank to the right lower quadrant

and inguinal region. Plaintiff reported that activities such as lifting and moving her legs increased the pain. Physical examination showed tenderness in the right lower quadrant of the abdomen and tenderness about the right side of plaintiff's back. Straight leg raising increased plaintiff's pain. Dr. Blatt opined that plaintiff was suffering musculoskeletal pain and an x-ray of the lumbo-sacral spine was ordered. Further metabolic testing was ordered regarding plaintiff's hepatitis C. (Tr. 253.)

X-rays of the lumbar spine taken November 27, 2002, showed mild degenerative changes. (Tr. 247.) CT scans of the abdomen and pelvis performed that same date showed mild diffuse fatty infiltration of the liver; several small lymph nodes, increased in number but not in mass; small left inguinal lymph node; and small left ovarian cyst. (Tr. 245.) It was recommended that plaintiff undergo a follow up abdominal CT scan in three to four months given the number of lymph nodes detected. (Tr. 244.)

Plaintiff missed a scheduled follow up appointment with Dr. Blatt on December 17, 2002. By letter and telephone communication, Dr. Blatt informed plaintiff of the recent test results. Dr. Blatt also recommended that plaintiff begin treatment for hepatitis C. (Tr. 244.)

In a letter to Dr. Keith Morris dated December 19, 2002, Dr. Blatt reported plaintiff's recent test results, noting that he

had prescribed Celebrex[1] for plaintiff's pain. Dr. Blatt recommended that plaintiff undergo a colonoscopy and stated that plaintiff should not begin treatment for her hepatitis C until the colonoscopy is completed. (Tr. 243.)

On January 9, 2003, plaintiff informed Dr. Blatt's office that Medicaid would not cover the cost of her Celebrex prescription. (Tr. 242.)

Plaintiff underwent a colonoscopy and biopsy on January 9, 2003. With the exception of the removal of two small polyps, the results of the examinations were essentially normal. (Tr. 238-41.)

Abdominal and pelvic CT scans performed on February 27, 2003, showed no change from the previous CT scans with respect to the lymph nodes. The ovarian cyst had resolved. (Tr. 237.)

Plaintiff visited Dr. Blatt on March 4, 2003. Dr. Blatt prescribed Peg-Intron[2] and Rebetol[3] for plaintiff and instructed that she schedule a time to meet with the office nurse to receive

---

[1]Celebrex is indicated for signs and symptoms of osteoarthritis and rheumatoid arthritis. Physicians' Desk Reference 2986 (55th ed. 2001).

[2]Peg-Intron is used to treat chronic hepatitis C infection in people who show signs of liver damage by decreasing the amount of hepatitis C virus in the body. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6050 30.html>.

[3]Rebetol is used to treat hepatitis C by stopping the virus that causes hepatitis C from spreading inside the body. Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a605018.html>.

injection instructions.  (Tr. 231.)  In a letter to Dr. Morris that same date, Dr. Blatt reported that plaintiff's abdominal pain had markedly improved and was no longer much of a concern to plaintiff. Dr. Blatt also noted that plaintiff would begin treatment for hepatitis C and that he anticipated such treatment to have a duration of forty-eight weeks.  (Tr. 234.)

In letters to plaintiff dated May 8 and May 14, 2003, Dr. Blatt noted that plaintiff had filled her prescriptions for treatment but that plaintiff had not yet received instruction on proper injection.  (Tr. 232, 233.)

On September 22, 2003, plaintiff contacted Dr. Blatt's office and reported that she wanted to start her medications.  On September 29, 2003, plaintiff visited Dr. Blatt's office to receive instruction for hepatitis C treatment, including the proper method for injections.  (Tr. 231.)

Plaintiff returned to Dr. Blatt on October 14, 2003, who noted plaintiff to have been undergoing hepatitis treatment for approximately three weeks.  It was noted that plaintiff experienced myalgias and occasional sweating, but felt good overall.  Plaintiff was instructed to return for follow up in two months.  (Tr. 228.)

On December 17, 2003, plaintiff missed her scheduled follow up appointment with Dr. Blatt.  (Tr. 227.)

In a telephone conversation with Dr. Blatt on February 3, 2004, plaintiff reported that she had developed a rash and that she

had just finished antibiotic treatment for urinary tract infection. Plaintiff reported that she experiences fever after her injections, but that this had occurred since she began treatment. Dr. Blatt noted that plaintiff was scheduled to visit him the following week. (Tr. 226.)

Plaintiff returned to Dr. Blatt on February 11, 2004, who noted plaintiff to have completed about three months of treatment for hepatitis C. Plaintiff was doing fairly well, although she complained of fatigue. Dr. Blatt noted that the fatigue was in part due to caring for four-year-old triplets. Plaintiff generally had a good appetite but reported having some trouble sleeping. Plaintiff denied any depressive thoughts or of having any suicidal ideation or severe depression. Dr. Blatt noted plaintiff to be quite willful and determined to be on therapy. Dr. Blatt noted, however, that plaintiff continued to have low amounts of measurable virus despite three months of treatment and noted this "not [to be] a good prognostic sign for her." Dr. Blatt recommended that plaintiff continue with treatment for at least another couple of months. Ativan was prescribed for sleep.[4] Prilosec was prescribed for occasional nausea. The possibility of placing plaintiff on antidepressants was considered. Plaintiff was instructed to return to Dr. Blatt for follow up in one month. (Tr. 210.)

---

[4]Ativan is also indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms. Physicians' Desk Reference 3348 (55th ed. 2001).

- 8 -

On March 17, 2004, plaintiff failed to appear for a scheduled appointment with Dr. Blatt.  (Tr. 205.)

Plaintiff returned to Dr. Blatt on April 7, 2004.  Dr. Blatt noted plaintiff to continue to test positive for the hepatitis C virus.  Dr. Blatt therefore determined for plaintiff to stop treatment inasmuch as it appeared unlikely that she could clear her condition with a year's treatment.  Dr. Blatt determined for plaintiff to undergo a liver biopsy.  (Tr. 200.)

An abdominal CT scan performed April 13, 2004, showed borderline splenomegaly and some pericaval and periaortic lymphadenopathy.  (Tr. 204.)

A liver biopsy performed on May 13, 2004, showed mild inflammation and stage 1 fibrosis.  No progression was noted since 2000.  Dr. Blatt noted plaintiff not to have responded to treatment but noted that with the slow progression of her disease there may be further treatment in the future.  (Tr. 199, 309-11.)

Plaintiff visited Dr. Jennifer Scheer on July 21, 2004, and complained of anxiety, back pain and difficulties with her right hand.  (Tr. 323.)  Plaintiff's history of hepatitis C was noted.  With respect to her anxiety, plaintiff requested refills of significant amounts of Ativan.  Plaintiff reported that she had taken antidepressants in the past but did not obtain good results.  Physical examination was unremarkable.  Plaintiff was diagnosed with trigger finger and a referral was arranged for a hand surgeon.  Plaintiff was also diagnosed with anxiety and was prescribed

BuSpar.[5]  Plaintiff was given a small amount of Ativan and was advised that no further Ativan would be prescribed.  (Tr. 323.)

On September 21, 2004, plaintiff complained to Dr. Scheer of, inter alia, diffuse abdominal pain.  Mild tenderness was noted upon palpation over the entire lower abdomen.  (Tr. 320.)  An abdominal CT scan performed October 11, 2004, showed no suspicious internal changes.  (Tr. 198.)

Plaintiff returned to Dr. Blatt on October 20, 2004, who noted plaintiff to have elevated alpha-fetoprotein, which Dr. Blatt opined to be consistent with hepatic inflammation.  Dr. Blatt also noted plaintiff to complain of anxiety.  Plaintiff reported that she had an upcoming appointment with a psychiatrist in one month.  Dr. Blatt prescribed Ativan for plaintiff.  (Tr. 197.)

On October 21, 2004, Dr. Scheer noted there to be no evidence of diverticulum or of any cyst.  (Tr. 320.)

In a telephone conversation of December 11, 2004, Dr. Blatt informed plaintiff that her alpha-fetoprotein level had decreased.  It was noted that plaintiff was scheduled to visit Dr. Blatt in February.  (Tr. 196.)

Plaintiff visited the Family Wellness Clinic on December 30, 2004, for a medical consult.  It was noted that plaintiff would

--------

[5]BuSpar is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a688005.html>.

be seeing a therapist. Plaintiff reported increased insomnia. It was noted that Trazodone[6] made plaintiff tired the following day. Plaintiff was noted to be stressed regarding her children. Plaintiff's mood was noted to be stable but with increased anxiousness. Plaintiff did not want to try SSRI's or antidepressants. Plaintiff was prescribed Ativan. (Tr. 278.)

Plaintiff returned to the Family Wellness Clinic on January 31, 2005, and reported increased stress due to her son being in prison. It was noted that he had been in prison since he was sixteen years of age. It was noted that plaintiff's mood was stable "for the most part," but that plaintiff experienced increased depression. Plaintiff was instructed to take Ativan as needed and was referred for therapy. (Tr. 278.)

On February 1, 2005, Dr. Scheer noted plaintiff to have been prescribed Ativan by other physicians. (Tr. 320.)

Plaintiff returned to Dr. Blatt on February 16, 2005. Dr. Blatt noted there to be no significant changes in plaintiff's metabolic elevation levels. Physical examination was unremarkable. Dr. Blatt noted plaintiff's depression and anxiety to have significantly improved. Dr. Blatt also noted that plaintiff was currently under the care of a psychiatrist and that she had been

---

[6]Trazodone is used to treat depression. Medline Plus (last revised Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html>.

prescribed Lorazepam[7] for sleep. Plaintiff was instructed to return in six months. (Tr. 195.)

Plaintiff returned to the Family Wellness Clinic on February 28, 2005. Plaintiff's mood was noted to be more stable. Plaintiff reported feeling good about herself. It was noted that plaintiff experienced no side effects from her medication. Plaintiff was instructed to continue with her medication with an increased dosage of Lorazepam. (Tr. 277.)

On March 29, 2005, plaintiff reported to the Family Wellness Clinic that she was experiencing more difficulties with her family. It was noted that plaintiff was more depressed with increased crying. Plaintiff reported that she wanted to be left alone. Plaintiff was instructed to continue with Lorazepam, and Lexapro[8] was prescribed. (Tr. 277.)

Plaintiff returned to the Family Wellness Clinic on April 26, 2005. Plaintiff was instructed to continue with her current medications. (Tr. 276.)

Plaintiff visited Dr. Mark Shen on May 16, 2005. Dr. Shen noted plaintiff's anxiety to remain stable and that plaintiff

---

[7]Lorazepam is also indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms. Physicians' Desk Reference 3348 (55th ed. 2001).

[8]Lexapro is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html>.

was using Ativan on an as-needed basis and did not appear to abuse it.  It was noted that plaintiff had triplets and that this was "excessively stressing on her."  Plaintiff reported that she had looked into stress/anxiety classes but that she could not afford them.  Plaintiff was prescribed BuSpar and was instructed to continue with Ativan.  Plaintiff was instructed to return in one month.  (Tr. 316-17.)

On May 24, 2005, plaintiff reported to the Family Wellness Clinic that she was losing her health insurance. Plaintiff's mood was noted to be stable.  Plaintiff reported no side effects from her medication.  Plaintiff was diagnosed with adjustment disorder with anxiety.  Plaintiff was prescribed Ativan. (Tr. 276.)

Plaintiff returned to the Family Wellness Clinic on June 30, 2005, who noted plaintiff to be doing well.  Plaintiff's mood was stable.  Plaintiff's mood and appetite were noted to be okay. Plaintiff was instructed to continue with Ativan.  (Tr. 275.)

An abdominal CT scan performed on July 21, 2005, showed the liver to appear normal.  Some lymphadenopathy was noted within the portacaval region and in the periaortic region.  (Tr. 302.)

On August 4, 2005, plaintiff failed to appear for a scheduled appointment at the Family Wellness Clinic.  (Tr. 275.)

Plaintiff visited the Family Wellness Clinic on August 30, 2005, and reported tightness in her chest and of feeling overwhelmed.  Plaintiff reported that her primary care physician

opined that she was anxious. Plaintiff reported increased depression and crying. It was noted that plaintiff quit her GED program because she was unable to concentrate. Plaintiff's affect was noted to be depressed. Cymbalta[9] was prescribed for plaintiff. (Tr. 275.)

On September 7, 2005, plaintiff failed to appear for a scheduled appointment with Dr. Blatt. (Tr. 190.)

In a letter to plaintiff dated September 10, 2005, Dr. Blatt reported that she continued to have some liver inflammation consistent with hepatitis C and that her recent abdominal CT scan was stable. It was noted that plaintiff was scheduled to visit Dr. Blatt in November. (Tr. 191.)

Plaintiff returned to the Family Wellness Clinic on September 24, 2005. Plaintiff's mood was noted to be more stable. Plaintiff was less depressed. Plaintiff reported no crying spells and that she was coping much better with life. Plaintiff reported no side effects with her medications. Plaintiff was instructed to continue with her current medications. (Tr. 274.)

On November 2, 2005, plaintiff failed to appear for a scheduled appointment with Dr. Blatt. (Tr. 190.)

On November 22 and December 8, 2005, plaintiff failed to appear for scheduled appointments at the Family Wellness Center. (Tr. 274.)

---

[9]Cymbalta is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a604030.html>.

On December 21, 2005, plaintiff visited Dr. Blatt who noted plaintiff to be generally doing well. Dr. Blatt noted plaintiff's labs to be stable, but that the alpha-fetoprotein level was mildly elevated. Physical examination was unremarkable. (Tr. 190.)

Plaintiff returned to the Family Wellness Clinic on February 2, 2006. It was noted that plaintiff was no longer taking Cymbalta since Medicaid did not cover its cost. Plaintiff reported that without the medication, she was sad and crying. Plaintiff was noted to have a depressed affect. Plaintiff was afraid to try Prozac. Plaintiff was prescribed Lexapro. (Tr. 274.)

On April 24, 2006, plaintiff underwent a psychological evaluation for disability determinations. Plaintiff was administered the Wechsler Intelligence Scale for Adults-III (WAIS-III), the Wechsler Memory Scale (WMS), the Trail-Making Tests, Mental Status Examination, and the Minnesota Multiphasic Personality Inventory-II (MMPI-II). Upon conclusion of the examination, Dr. Paul Rexroat determined plaintiff's overall cognitive ability to be in the low average range, with plaintiff's verbal IQ score noted to be 79, performance IQ score to be 95, and full scale IQ score to be 85. Plaintiff's working memory capacity was noted to be in the average range. When comparing plaintiff's WAIS-III and WMS results, Dr. Rexroat opined that plaintiff had relative strength in her overall delayed memory. Plaintiff's results on the Trail-Making Tests were in the normal range. Mental

status examination showed significant symptoms of major recurrent depression. The MMPI-II profile supported a diagnosis of depression. In the various domains of functioning, Dr. Rexroat opined as follows: In the domain of Activities of Daily Living, Dr. Rexroat noted plaintiff to care for her six-year-old triplets and to do all of the housework when she feels able. Plaintiff is tired due to her hepatitis condition. Plaintiff reported having good days and bad days with respect to the strength she has to get things done. Plaintiff does the cooking, the laundry and the shopping. Plaintiff drives. Plaintiff has difficulty going up and down stairs. Plaintiff watches television three to four hours a day. Dr. Rexroat opined that plaintiff had marked limitations in this domain. In the domain of Social Functioning, Dr. Rexroat noted plaintiff to exhibit many good social skills. Plaintiff reported that she had one good friend and that she visits her mother occasionally. Plaintiff reported that she avoids contact with the rest of her family because many of them are drug users and have other problems. Dr. Rexroat opined that plaintiff had mild limitations in this domain. In the domain of Concentration, Persistence and Pace, Dr. Rexroat noted plaintiff to have been able to sustain concentration, persistence and pace during the examinations and that plaintiff's memory functioning was generally in the average range. Dr. Rexroat opined that plaintiff was able to manage her own funds. Dr. Rexroat opined that plaintiff was functionally limited in that she was "able to understand and

remember simple instructions. She can sustain concentration and persistence with simple tasks. She has mild limitations in her ability to interact socially and has marked limitations in her ability to adapt to her environment." Dr. Rexroat diagnosed plaintiff with major depression, recurrent, moderate. Plaintiff was assigned a Global Assessment of Functioning (GAF) score of 56. (Tr. 279-92.)

On May 1, 2006, Dr. Rexroat completed a Medical Source Statement (Mental) for disability determinations wherein he opined that plaintiff had no limitations in her ability to understand, remember and carry out short, simple instructions. Dr. Rexroat opined that plaintiff's major depression would produce moderate limitations in plaintiff's ability to understand, remember and carry out detailed instructions, as well as in her ability to make judgments on simple work-related decisions. Dr. Rexroat further opined that plaintiff would have moderate limitations in her ability to interact appropriately with the public, with supervisors and with co-workers, and to respond appropriately to work pressures in a usual work setting and to changes in a routine work environment. Finally, Dr. Rexroat opined that plaintiff could not manage benefits in her own best interest. (Tr. 293-95.)

Plaintiff returned to the Family Wellness Clinic on May 8, 2006. Plaintiff reported that she felt irritable on Lexapro and stopped taking the medication. It was noted that plaintiff was present for a disability evaluation. Plaintiff reported increased

depression and anxiety. Plaintiff's affect was noted to be depressed. Plaintiff was prescribed Celexa.[10] It was noted that plaintiff's current psychiatrist was leaving the Family Wellness Clinic June 30, 2006, and that plaintiff would need to see another psychiatrist. (Tr. 273.)

A CT scan of plaintiff's abdomen performed on May 26, 2006, showed enlarged lymph nodes in the porta hepatic. It was determined that the lymph nodes were likely reactive to plaintiff's underlying liver inflammation. The CT scan also showed the liver to have normal and uniform enhancement with no space occupying lesions. (Tr. 183-85.)

On June 12, 2006, plaintiff failed to appear for a scheduled appointment at the Family Wellness Clinic. (Tr. 272.)

Plaintiff visited Dr. Blatt on June 14, 2006. Dr. Blatt noted plaintiff to be generally doing well. Physical examination was unremarkable. Plaintiff expressed interested in beginning new treatment for her hepatitis C. (Tr. 182.)

On June 16, 2006, plaintiff failed to appear for a scheduled appointment at the Family Wellness Clinic. (Tr. 272.)

On June 28, 2006, Dr. Blatt noted plaintiff to be very anxious to proceed with some sort of treatment for her hepatitis condition. Dr. Blatt determined to contact a hepatologist for further information. (Tr. 182.)

_____

[10]Celexa is indicated for the treatment of depression. <u>Physicians' Desk Reference</u> 1258 (55th ed. 2001).

## IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on December 12, 1998, but was not insured after June 30, 2002.  The ALJ also found that plaintiff had not engaged in substantial gainful activity since December 12, 1998.  The ALJ found plaintiff to have been more than minimally limited by hepatitis C but that plaintiff's condition did not meet or medically equal one listed in Appendix 1, Subpart P, Regulations No. 4.  The ALJ found plaintiff's allegations not to be fully credible.  The ALJ determined that since December 12, 1998, plaintiff has had the residual functional capacity (RFC) to lift, carry, push, or pull ten pounds occasionally and less than ten pounds frequently; to sit six hours in an eight-hour day; to stand or walk a total of two hours in an eight-hour day; and that the work must not involve reading or writing.  The ALJ found plaintiff to be functionally illiterate. The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age, literacy skills and RFC, the ALJ determined that, under Medical-Vocational Rule 201.25 of 20 C.F.R., Pt. 404, Appendix 2, Table No. 1, plaintiff was able to perform work existing in significant numbers in the national economy since December 12, 1998.  The ALJ therefore found plaintiff not to be under a disability since December 12, 1998.  (Tr. 18-19.)

## V. Discussion

To be eligible for Social Security Disability Insurance

Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's

impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and requests that the ALJ's decision be reversed and the cause remanded to the Commissioner for further consideration. Plaintiff first claims that in making his RFC determination, the ALJ failed to properly consider plaintiff's mental impairment inasmuch as he erroneously found the impairment not to be severe. Plaintiff further argues

that there exists no medical evidence in the record to support the ALJ's findings with respect to plaintiff's physical RFC, and thus that the record was not fully and fairly developed. Plaintiff also contends that the ALJ erred in finding plaintiff's subjective complaints not to be credible. Finally, plaintiff argues that the ALJ erred in his failure to solicit the testimony of a vocational expert inasmuch as there existed evidence in the record that plaintiff suffered from non-exertional impairments.

A.    Credibility Determination

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the

duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez, 403 F.3d at 957; Pearsall, 274 F.3d at 1218.

In this cause, the ALJ set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted that plaintiff was able to take care of six-year-old triplets and to perform household chores such as ironing, washing dishes, doing laundry, vacuuming, and dusting. The ALJ also noted that plaintiff goes grocery shopping. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (cooking, cleaning, doing laundry, shopping, studying, exercising, and being primary caretaker of home and two small children

inconsistent with inability to work on a daily basis); <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1995) (daily caring for one child, driving when unable to find a ride, and sometimes going grocery shopping). The ALJ noted that although plaintiff claimed that she must take her time when performing tasks because of shortness of breath, the record did not show such condition to be related to plaintiff's hepatitis C and, further, that plaintiff nevertheless smoked tobacco. <u>See</u> <u>McGeorge v. Barnhart</u>, 321 F.3d 766, 768 (8th Cir. 2003) (claimant rarely sought treatment for shortness of breath and continued to smoke cigarettes). The ALJ also noted that plaintiff claimed that she had been disabled since December 1998, but that she did not apply for disability for nearly six and a half years subsequent thereto. The ALJ noted plaintiff to be taking medication and the record shows plaintiff not to suffer any side effects therefrom. The ALJ also noted plaintiff to have a poor earnings record in that from 1988 to 1997, prior to plaintiff's alleged onset date of disability, plaintiff had no earnings during three years and annual earnings of less than $1,200.00 in four years. <u>See</u> <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility). Finally, the ALJ observed that plaintiff's difficulty with reading and writing appeared inconsistent with plaintiff's ability to work as a waitress. Substantial evidence on

the record as a whole supports these findings.

Plaintiff specifically challenges only the ALJ's credibility findings with respect to the performance of daily activities, arguing that the ability to engage in sporadic light activities does not support a finding that plaintiff can perform work. Contrary to plaintiff's assertion, however, the ALJ did not find that plaintiff engages in only sporadic light activities. The ALJ specifically noted that plaintiff had raised her six-year-old triplets since birth. This activity cannot be characterized as either light or sporadic. In addition, the ALJ noted that plaintiff also engaged in regular household chores such as ironing, washing dishes, laundry, vacuuming, dusting, and going grocery shopping. When coupled with the daily task of caring for three young children, the performance of such activities does not support a claim of inability to perform work-related activities. See, e.g., Young, 221 F.3d at 1069; Pena, 76 F.3d at 908; see also Johnston v. Apfel, 210 F.3d 870, 874-75 (8th Cir. 2000). The ALJ did not err in his determination that plaintiff's daily activities did not support her subjective complaints of disabling symptoms.

The plaintiff also generally claims that she suffers side effects from her treatment with Interferon, namely, depression and borderline IQ. Assuming *arguendo* that plaintiff's depression was indeed a side effect of plaintiff taking Interferon, the record nevertheless establishes that plaintiff's depressive condition can be and has been successfully treated. As such, to the extent

- 26 -

plaintiff's depression can be considered a side effect, it does not detract from the ALJ's adverse credibility finding. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999) (adverse credibility determination supported by evidence that claimant's condition was controlled successfully by medication). There is no evidence in the record to support the plaintiff's assertion that plaintiff's borderline IQ was a side effect of any of plaintiff's medication. The ALJ therefore did not err in failing to address it as such.[11]

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).

B.   Residual Functional Capacity

Residual functional capacity is what a claimant can do despite her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for

---

[11]But see discussion infra at Sec. V.C.

assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  Id.  An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how the claimant's impairments affect her current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment.  See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

1.  *Mental Impairment*

Plaintiff first contends that the ALJ's decision as to her RFC is not supported by substantial evidence on the record as

a whole inasmuch as the ALJ failed to consider plaintiff's mental impairment by determining it not to be a severe impairment at step two of the evaluation process.

In addition to the five-step sequential process by which the Commissioner is to generally determine disability, the Social Security Regulations provide additional procedures for the Commissioner to undergo in evaluating mental impairments. 20 C.F.R. §§ 404.1520a, 416.920a. First, the Commissioner must evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable impairment; and specify such symptoms, signs and laboratory findings substantiating the presence of such impairment. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). The Commissioner then must determine the severity of the impairment. To do so, the Commissioner is required to rate the degree of functional loss the claimant suffers as a result of the impairment in the areas of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. . . .

. . .

> If we rate the degree of your limitation
> in the first three functional areas as "none"
> or "mild" and "none" in the fourth area, we
> will generally conclude that your
> impairment(s) is not severe . . . .

20 C.F.R. §§ 404.1520a(c)(4)-(d)(1), 416.920a(c)(4)-(d)(1).

If the mental impairment is determined to be "severe," the
Commissioner must then determine if it meets or equals a listed
mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). If
the severe impairment does not meet or equal a listed mental
disorder, the Commissioner then performs an RFC assessment. 20
C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). At the initial and
reconsideration steps of the administrative process, the
Commissioner must complete a standard document outlining the steps
of this procedure. At the hearing and Appeals Council levels,
application of the procedure must be documented in the written
decision. 20 C.F.R. §§ 404.1520a(e), 416.920a(e).

> The decision must show the significant
> history, including examination and laboratory
> findings, and the functional limitations that
> were considered in reaching a conclusion about
> the severity of the mental impairment(s). The
> decision must include a specific finding as to
> the degree of limitation in each of the
> functional areas described in paragraph (c) of
> this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

"These procedures are intended to ensure a claimant's mental health

impairments are given serious consideration by the Commissioner in determining whether a claimant is disabled." <u>Plummer v. Apfel</u>, 182 F.3d 422, 432 (3d Cir. 1999). The Commissioner's failure to follow the appropriate procedure in determining the severity of a claimant's mental impairment requires a remand. <u>Pratt v. Sullivan</u>, 956 F.2d 830 (8th Cir. 1992); <u>see also</u> <u>Hill v. Sullivan</u>, 924 F.2d 972, 975 (10th Cir. 1991).

A review of the ALJ's decision here shows him to have diligently followed this prescribed procedure and to have found plaintiff's mental impairment not to be severe inasmuch as plaintiff had no restrictions of activities of daily living; no difficulties maintaining concentration, persistence or pace; no more than mild difficulties maintaining social functioning; and no episodes of decompensation. (Tr. 15-16.) The ALJ reached this conclusion after thoroughly reviewing all the evidence of record relating to plaintiff's mental impairment, including the extent to which plaintiff sought and received mental health treatment and the results of objective evaluations. The ALJ also accorded appropriate weight to the opinions of the mental health professionals who rendered opinions as to the level of plaintiff's mental functioning. Although such mental health professionals were not plaintiff's treating physicians, the ALJ nevertheless provided good reasons for the weight accorded each opinion. <u>See</u> 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). To the extent the ALJ determined to discount that portion of Dr. Rexroat's opinion in which he

determined plaintiff to be markedly impaired in her activities of daily living, the ALJ appropriately observed that such conclusion was not based on plaintiff's mental impairment but rather was based on plaintiff's *physical* abilities to perform activities such as caring for her children, performing housework, cooking, doing laundry, having strength to perform such chores, driving, going up and down stairs.  (See Tr. 287.)  In addition, to the extent an inconsistency existed between Dr. Rexroat's Medical Source Statement (Mental) and his written report made upon the conclusion of plaintiff's evaluation, the ALJ properly determined to credit Dr. Rexroat's narrative findings over his cursory findings made in the Statement inasmuch as such Statement was merely a checklist format.  An ALJ does not err in discounting those portions of a Medical Source Statement which are inconsistent and unsupported. Strongson v. Barnhart, 361 F.3d 1066, 1071 (8th Cir. 2004); Hogan, 239 F.3d at 961.

Therefore, for the foregoing reasons, the ALJ underwent the proper analysis in determining that plaintiff's mental impairment did not rise to the level of a severe impairment under the Regulations, and substantial evidence on the record as a whole supports this determination.  Although an inconsistent position may be drawn from the evidence, the Court must affirm the ALJ's decision if it is supported by substantial evidence.  Goff, 421 F.3d at 789.

*2. Physical RFC*

Plaintiff complains that the ALJ failed to articulate
what medical evidence in the record supported his determination
that plaintiff retained the physical RFC to lift, carry, push, or
pull ten pounds occasionally and less than ten pounds frequently;
to sit six hours in an eight-hour day; to stand or walk a total of
two hours in an eight-hour day. Plaintiff also argues that because
there exists no medical evidence in the record as to plaintiff's
physical abilities to perform work-related activities, the ALJ
failed in his duty to fully and fairly develop the record.
Plaintiff does not allege that the record is missing any relevant
medical records.

The undersigned first notes that an ALJ is not required
to discuss every piece of evidence submitted. An ALJ's failure to
cite specific evidence does not indicate that such evidence was not
considered. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).
Nevertheless, a review of the ALJ's decision and the medical
evidence of record shows the ALJ's decision as to plaintiff's
physical RFC to be supported by substantial evidence on the record
as a whole inasmuch as some medical evidence supports the ALJ's
finding. First, as noted by the ALJ, the medical evidence shows
that in August 2000, plaintiff's hepatitis condition was
asymptomatic and that plaintiff's past complaints of fatigue had
resolved. In November 2002, plaintiff complained of
musculoskeletal pain, but x-rays showed only mild degenerative

changes. In March 2003, it was noted that plaintiff's pain had improved and was no longer a concern. The ALJ noted that in October 2003, while plaintiff complained of some muscle pain, she reported that she felt good overall. In February 2004, plaintiff reported that she was doing fairly well but felt fatigued. Notably, plaintiff's treating physician opined that such fatigue was due in part to her caring for her young triplets. In July 2004, plaintiff reported having back pain and of symptoms associated with a trigger finger. In September 2004, plaintiff complained of diffuse abdominal pain, but diagnostic testing showed nothing suspicious. Finally, in February 2005, December 2005 and June 2006, Dr. Blatt's physical examinations of plaintiff were unremarkable. In light of this medical evidence which shows only sporadic and limited physical complaints which resulted in no restriction of activities, it cannot be said that no medical evidence exists in the record to support the ALJ's finding that plaintiff can perform the exertional requirements of sedentary work. See, e.g., Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (objective tests showed nothing more than mild to moderate impairments and no treating physician restricted activities in any way); Hilkemeyer v. Barnhart, 380 F.3d 441, 447 (8th Cir. 2004) (where medical evidence indicated only mild conditions and record did not suggest there were any limitations caused thereby, ALJ did not err in failing to find claimant to have a more restricted RFC); see also Steed v. Astrue, 524 F.3d 872, 876

- 34 -

(8th Cir. 2008) (failure to have medical evidence with specific information regarding exertional capabilities or limitations does not destroy ALJ's RFC determination where there is some medical evidence to support the ALJ's decision).  Although an inconsistent position may be drawn from the evidence, the Court must affirm the ALJ's decision if it is supported by substantial evidence.  <u>Goff</u>, 421 F.3d at 789.  <u>See also</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 875-76 (8th Cir. 2008).

To the extent plaintiff argues that the lack of medical evidence of plaintiff's limitations demonstrates the ALJ's failure to fully and fairly develop the record, the undersigned notes that plaintiff fails to allege that the record is missing any relevant medical records.  Without informing the Court what additional medical evidence should be obtained, plaintiff cannot establish that the ALJ's alleged failure to fully develop the record resulted in prejudice.  Plaintiff has therefore provided no basis for remanding this cause to the Commissioner for additional evidence. <u>See</u> <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005); <u>Shannon v. Chater</u>, 54 F.3d 484, 488 (8th Cir. 1995) ("[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.").

To the extent plaintiff argues that the ALJ should have recontacted plaintiff's treating physician for additional or clarifying information, the ALJ is not required to seek such information from a treating physician unless a crucial issue is

undeveloped.  _Goff_, 421 F.3d at 791 (citing _Stormo v. Barnhart_, 377 F.3d 801, 806 (8th Cir. 2004)).  While the Regulations provide that the ALJ should recontact a treating physician in some circumstances, "that requirement is not universal."  _Hacker v. Barnhart_, 459 F.3d 934, 938 (8th Cir. 2006).  Instead, the Regulations provide that the ALJ should recontact medical sources "[w]hen the evidence [received] from [the claimant's] treating physician or psychologist or other medical source is inadequate" for the ALJ to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1512(e), 416.912(e).  There is no need to recontact a treating physician where the ALJ can determine from the record whether the claimant is disabled.  _Hacker_, 459 F.3d at 938.  As set out above, there was sufficient medical evidence in the record from which the ALJ could determine plaintiff's physical RFC.  The ALJ therefore did not err in failing to recontact plaintiff's treating physician to obtain additional or clarifying information relating thereto.

C.  Vocational Expert Testimony

Plaintiff claims that the ALJ erred in failing to solicit the testimony of a vocational expert as to what work plaintiff can perform in the national economy inasmuch as plaintiff suffers from an intellectual non-exertional impairment.  Because the ALJ did not address plaintiff's IQ scores and thus whether such scores would affect a finding that plaintiff's intellectual impairment may or may not constitute a non-exertional impairment, this cause should

be remanded for further consideration of plaintiff's intellectual impairment.

Where an ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to show that there are other jobs that the claimant is capable of performing. <u>Reed v. Sullivan</u>, 988 F.2d 812, 815 (8th Cir. 1993). If the claimant suffers from only exertional impairments, this burden may be met by reference to the Guidelines. <u>Bolton v. Bowen</u>, 814 F.2d 536, 537 n.3 (8th Cir. 1987). Use of the Guidelines is also permissible where a non-exertional impairment is found to exist "provided that the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." <u>Harris v. Shalala</u>, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988)). <u>See also</u> <u>Bolton</u>, 814 F.2d at 537-38. The burden is on the ALJ to demonstrate that the use of the Guidelines is proper. <u>Lewis v. Heckler</u>, 808 F.2d 1293, 1298 (8th Cir. 1987). Where a non-exertional impairment significantly diminishes the claimant's RFC, the Guidelines are not controlling and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. <u>Harris</u>, 45 F.3d at 1194; <u>Sanders v. Sullivan</u>, 983 F.2d 822, 823 (8th Cir. 1992); <u>Thompson v. Bowen</u>, 850 F.2d 346, 350 (8th Cir. 1988).

The record here shows that in April 2006, plaintiff obtained the following IQ scores: verbal, 79; performance, 95; and full scale, 85. Dr. Rexroat determined plaintiff's full scale IQ score of 85 to place her in the low average range of intellectual functioning, noting that the full scale IQ score is "usually considered to be the most representative measure of . . . global intellectual functioning." (Tr. 279.) Although the ALJ discussed Dr. Rexroat's consultative examination in his written decision, the ALJ neither addressed plaintiff's IQ scores nor provided any reason why such scores should not be considered valid.

Where evidence demonstrates that a claimant lacks adequate intellectual capacity, an ALJ is precluded from relying on the Medical-Vocational Guidelines to find a claimant not disabled. Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001); Holz v. Apfel, 191 F.3d 945, 947 (8th Cir. 1999). Accordingly, an intellectual impairment constitutes a non-exertional impairment which must be considered by a vocational expert. Spencer v. Bowen, 798 F.2d 275, 277 n.2 (8th Cir. 1986).

Here, plaintiff obtained a full scale IQ score of 85 which placed her one point above the range of borderline intellectual functioning. See Thomas v. Sullivan, 876 F.2d 666, 668 n.1 (8th Cir. 1989). Plaintiff's verbal IQ score of 79, however, is within such range. Id.[12] When coupled with plaintiff's

_____

[12]Notably, the Social Security Listings for intellectual disabilities do not distinguish between verbal, performance and

functional illiteracy, inability to perform past relevant work, and physical limitation to sedentary work, it could reasonably be determined that plaintiff's intellectual functioning constitutes a non-exertional impairment which significantly limits plaintiff's ability to perform the full range of sedentary work. E.g., Muncy, 247 F.3d at 735. Without the benefit of the ALJ's analysis in this regard, however, this Court cannot determine whether the ALJ's use of the Guidelines in the circumstances of this case, and thus his failure to call a vocational expert to testify as to an intellectual impairment, was proper. Id.

> The ALJ may have considered and for valid reasons rejected the . . . evidence proffered . . . ; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision; we cannot speculate whether or why an ALJ rejected certain evidence. Accordingly, remand is necessary to fill this void in the record.

Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995) (citation omitted).

This cause should therefore be remanded to the Commissioner to determine in the first instance whether plaintiff's IQ scores, when coupled with plaintiff's other intellectual and

_____

full scale IQ scores upon which a finding of disability is to be based. Instead, any of such scores may be used. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05.

physical impairments, constitute a non-exertional impairment such that reliance on the Guidelines is precluded.  See Muncy, 247 F.3d at 735.


                Therefore, for all of the foregoing reasons,

        **IT   IS   HEREBY   ORDERED** that  the  decision  of  the Commissioner  is  reversed  and  this  cause  is  remanded  to  the Commissioner for further proceedings consistent with this opinion.

        Judgment shall be entered accordingly.




                                    _Frederick R. Buckles_
                           UNITED STATES MAGISTRATE JUDGE




Dated this  _24th_  day of September, 2008.